**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SHAKER FARMS, INC. | ) |
|  | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
|  | ) |
| v. | ) |
|  | ) |
| City of Westfield, Massachusetts | ) |
|  | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

**<u>INTRODUCTION</u>**

1.      This action is a citizen suit brought under Section 505 of the Clean Water Act, 33 U.S.C. § 1365, as amended, to address violations of effluent standards and limitations including significant water-quality problems and programmatic deficiencies associated with the municipal separate storm sewer system ("MS4") owned and operated by the City of Westfield, Massachusetts (the "City").  Plaintiff Shaker Farms, Inc.  ("SFI") seeks declaratory judgment, injunctive relief, and other relief with respect to the actions and failures to act by the City.  These actions and failures by the City have resulted in discharges of pollutants into waters of the United States in violation of Sections 30l(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 131 l(a) and 1342, and applicable Clean Water Act regulations, and the terms of the City's municipal separate storm sewer system ("MS4") General Permit ("the Permit").

**JURISDICTION AND VENUE**

2. This Court has subject matter jurisdiction over this action pursuant to Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment).

3. Pursuant to Section 505(b)(l)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(l)(A), and 40 C.F.R. § 135, Plaintiff notified Defendants of their violations of the Clean Water Act, and of Plaintiffs intent to sue under the Clean Water Act, by letter dated and sent to them via certified mail on August 8, 2024 ("Notice Letter"). A true and accurate copy of the Notice Letter is attached as Exhibit 1.

4. More than sixty days have passed since Plaintiff mailed Defendants its Notice Letter. The Clean Water Act violations complained of in the Notice Letter are of a continuing nature, ongoing, or reasonably likely to re-occur. Defendants remain in violation of the Clean Water Act. As of the filing of this Complaint, neither EPA nor Massachusetts has commenced an enforcement action to redress the violations identified in the Notice Letter.

5. Venue is appropriate in the District of Massachusetts pursuant to Section 505(c)(l) of the Clean Water Act, 33 U.S.C. § 1365(c)(l), and 28 U.S.C. § 1391(b)(2), because the City's separate storm sewer system and the Clean Water Act violations that are the subject of this Complaint are located in Massachusetts.

**PARTIES**

6. Plaintiff SFI is a duly incorporated Massachusetts corporation with its principal place of business located at 54 Western Avenue, West Springfield, Massachusetts. SFI is the owner of the Shaker Farms Country Club ("SFCC"), a public golf course located at 866 Shaker Road, Westfield, Massachusetts. The SFCC is the locus of the violations alleged in this

2

Complaint.

7.      Defendant City of Westfield is a duly chartered municipal corporation in the Commonwealth of Massachusetts.  Its mayor, elected by qualified voters of the City, is its chief executive officer, and elects all heads of departments and members of municipal boards.  The City Council, composed of thirteen (13) members, exercises the City's legislative authority.

*8.*      The City owns and operates an MS4 in the City pursuant to 40 C.F.R. §§ 122.26(b)(8) and (16).  Specifically, the MS4 constitutes a system of conveyances discharging pollutants (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains), which are: (1) designed or used for collecting or conveying stormwater that is not a combined sewer or publicly owned treatment works, and (2) owned or operated by a public body created pursuant to state law and having jurisdictional authority over stormwater. The Clean Water Act is the principal federal statute enacted to protect the quality of the Nation's surface water resources.  *See* Clean Water Act § 101 *et seq.,* 33 U.S.C. § 1251 *et seq.*

### STATUTORY BACKGROUND

9.      The stated goal of the Clean Water Act is "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." Clean Water Act § 10l(a)(l), 33 U.S.C. § 1251(a)(l).

10.      Section 301 of the Clean Water Act, 33 U.S.C. § 1311, prohibits the discharge of any pollutant, by any person, from any point source, Clean Water Act § 502(12)(A), 33 U.S.C. § 1362(12)(A), to the waters of the United States, Clean Water Act§ 502(7), 33 U.S.C. § 1362(7), except where expressly authorized under valid National Pollutant Discharge Elimination System ("NPDES") permits issued by EPA or an EPA-delegated State permitting

authority, 40 C.F.R. § 122.2.

11.    "Point source" is defined broadly under Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14), to include, "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

12.    The Commonwealth of Massachusetts has not sought authorization for a state-administered NPDES program pursuant to Section 402(b) of the Clean Water Act, 33 U.S.C. § 1342(b).  Therefore, in Massachusetts, the NPDES permit program is administered by EPA pursuant to Section 402(a) of the Clean Water Act, 33 U.S.C. § 1342(a).

13.    Small municipal separate storm sewer systems are required to obtain NPDES permit coverage for their stormwater discharges, pursuant to the statutory mandate set forth in Section 402(p)(6) of the Clean Water Act, 33 U.S.C. § 1342(p)(6).  40 C.F.R. §§ 122.30-.37

14.    A "municipal separate storm sewer" is defined as a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains), (i) owned or operated by a public body created by or pursuant to State law having jurisdiction over disposal of sewage, industrial wastes, stormwater, or other wastes, (ii) designed or used for collecting or conveying stormwater, (iii) which is not a combined sewer, and (iv) which is not part of a Publicly Owned Treatment Works. 40 C.F.R. § 122.26(b)(8).

15.    "Small municipal separate storm sewer systems" are defined in pertinent part as separate storm sewers that are (i) owned or operated by a public body created by or pursuant to State law having jurisdiction over disposal of sewage, industrial wastes, stormwater, or other

wastes, and (ii) not defined as large or medium municipal separate storm sewer systems or designated by the EPA as contributing to a violation of a water quality standard or pollutants to waters of the United States.

16. Small municipal separate storm sewer system operators are required to obtain NPDES permit coverage if their small municipal storm sewer system is located in an urbanized area as determined by the latest Decennial Census by the Bureau of the Census. *Id§* 122.32.

17. Permit coverage for small municipal storm sewer systems can be obtained under either a general permit, such as EPA's 2016 General Permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems in Massachusetts, as modified on December 7, 2020 ("the Permit"), or under an individual permit tailored to the site- specific characteristics of the system, as set out in 40 C.F.R. § 122.33.

18. The Permit requires regulated small municipal separate storm sewer system operators in Massachusetts to, at a minimum, develop, implement, and enforce a stormwater management program, which must detail the stormwater control practices that will be implemented consistent with permit requirements to reduce the discharge of pollutants from the small municipal separate storm sewer systems to the maximum extent practicable. 40 C.F.R. § 122.34.

19. Section 505(a)(l) of the Clean Water Act, 33 U.S.C. § 1365(a)(l), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation ... or an order issued by the Administrator or a State with respect to such a standard or limitation."

20. Such enforcement action under Section 505(a)(l) of the Clean Water Act, 33

U.S.C. § 1365(a)(l), includes an action seeking remedies for unauthorized discharge under Section 301 of the Clean Water Act, 33 U.S.C § 1311, as well as for violation of a permit condition under Sections 402 and 505(f) of the Clean Water Act, 33 U.S.C. § 1342, and Section 505(f) of the Clean Water Act, 33 U.S.C. § 1365(f).

21.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $66,712 per day per day per violation for all Clean Water Act violations occurring after November 2, 2015 pursuant to Sections 309(d) and 505(a) of the Clean Water Act, 33 U.S.C. §§ 1319(d) and 1365(a), and to 40 C.F.R. §§ 19.1-.4.

## BACKGROUND FACTS

22.     Stormwater runoff contains a wide variety of pollutants, including priority organics, toxic chemicals, oil and grease, metals, nutrients, organic constituents, suspended solids, and pathogens.  Stormwater runoff and surface water discharges from municipal separate storm sewers are a major cause of water quality impairment in rivers, lakes, estuaries and coastal areas across the United States and in Massachusetts.  Stormwater runoff causes exceedances of water quality standards by contributing significant amounts of pollution to receiving waters, changing natural hydrologic patterns, accelerating stream flows, destroying aquatic habitat, and elevating pollutant concentrations and loadings.

23.     Stormwater is the leading cause of impaired water quality in Massachusetts.

24.     The City is located within the Connecticut and Westfield River watersheds. There are eight primary tributaries, Ashley Brook, Cook Brook, Great Brook, Jacks Brook, Little Brook, Pond Brook, Powdermill Brook, and Moose Meadow Brook, that flow through the community before discharging into the Westfield River.

25.     The Westfield River runs through the City, providing several locations for

6

swimming, boating, and fishing for the community. Additionally, Hampton Ponds State Park, located on the northern border of the City, is a location where community members can boat, swim, and fish in Hampton and Pequot Pond. The City's drinking water is sourced from the Granville Reservoir, in Granville, MA, the City's eight groundwater wells, and the City of Springfield when necessary.

26. The Westfield Department of Public Works maintains over 130 miles of stormwater drainage pipe, thousands of drainage structures (manholes and catch basins), and these stormwater drainage systems discharge stormwater to the environment in hundreds of locations.

27. Pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), EPA has designated the Receiving Waterbodies as impaired for failure to meet minimum water quality standards. The Receiving Waterbodies are variously impaired for pesticides (including DEHP, or Di-sec octyl phthalate), pathogens (including Escherichia coli, or E. coli), arsenic, phosphates, chromium, total toxics (including polycyclic aromatic hydrocarbons (PAHs) in aquatic ecosystems and sediment bioassays for acute freshwater toxicity), nuisance exotic species (non-native aquatic plants), and noxious aquatic plants.

28. Several of Westfield's streams are considered "impaired" by the Massachusetts Department of Environmental Protection ("MassDEP"). Many of these impairments are due to excessive bacterial indicators. These can come from upstream sources, septic leaks, wildlife, leaking sewer systems or other sources of wastewater.

29. As a portion of the City is within the Connecticut River watershed, which eventually drains to Long Island Sound, there is also special consideration for nitrogen in stormwater which can be attributed to atmospheric deposition, fertilizers, and other natural

sources, like leaf litter and grass clippings.

30. The City has had MS4 permit coverage since 2003, and is currently operating under the permit, as modified on December 7, 2020.

31. As part of the permitting requirements, the City is required to develop a written Stormwater Management Program (SWMP). The SWMP is a "living" reference document that guides the City's implementation of requirements within the permit. Westfield is required to keep records of, and report on, the activities and measures that are implemented and consistent with this Plan.

32. 32. The City is responsible for conducting maintenance on its roads, ditches, catch basins, and storm drains.

33. The Permit is designed to require operators of MS4's like the City's to reduce the discharge of pollutants from their municipal systems to the maximum extent practicable, and includes the following requirements to address discharges from MS4s:

    a. develop, implement, and enforce a stormwater management program;

    b. address stormwater runoff from new development and redevelopment;

    c. reduce pollutants in stormwater runoff from construction activities; and

    d. opportunities for the public to participate in the development, implementation and review of the operator's stormwater management program.

34. The City has claimed a right to discharge stormwater from public roadways onto the SFCC property.

35. An easement, granted in 1961 by Shaker Farms, Inc. to Edward M. Shaker and Mandabell Saloomey, granted the "right to construct and duty to maintain a water pipe line and drainage ditch for drainage purposes under and over a certain strip of land located in said

Westfield, said strip of land ten (10) feet in width . . ." See, Hampden County Registry of Deeds Book 2909, Page 485.

36.     The easement refers then to a starting point at which the easement would proceed "southerly with a thirty (30) inch pipe following the course of the present pipe a distance of about three hundred (300) feet to an intermittent brook . . ." It then continues with a metes and bounds description of the path of the easement through the SFCC property.

37.     By a later grant in 1966, Book 3196, Page 243, Shaker and Saloomey purported to convey to the City of Westfield certain drainage easement rights over other land, and then included whatever rights they had to "rights granted by Shaker Farms, Inc. to Grantees as recorded at Hampden County Registry of Deeds, Book 2909, page 485."

38.     To the extent to which the City exercised its right to drain water under that grant, the "easement is granted subject to the provisions that the grantees, their heirs, executors, administrators and assigns (1) shall keep the open ditches free and clear of all obstructions and of sufficient depth to carry the volume of water discharged into them; and (2) shall maintain the thirty (30) inch pipe lines at full operating capacity with such replacement from time to time as may be necessary; and, (3) shall maintain and keep in good repair all headers."

39.     There is no evidence known at this time to indicate the City ever constructed a new 30" pipe, or that any pre-existing pipe exists on the premises.

40.     Although the City has directed stormwater from several definitive subdivisions to a certain 24" pipe outlet, from which water flows towards the SFCC, the City has failed to undertake maintenance work along the ditch between the 24" outlet and SFCC property, or within the SFCC property to keep the "ditches free and clear of all obstructions and of sufficient depth to carry the volume of water discharged into them."

41.     The ditches on the SFCC property, as well as a pond on the SFCC, have been filled with sediment from the City's unlawful stormwater discharge.

42.     The City's overburdening, misuse of and failure to maintain the drainage easement on SFI property has resulted in storm water runoff to SFI property well beyond the ten (10) foot wide easement.

43.     The MS4 requires the City to map all of its open channel conveyances of stormwater – in other words, the ditches that carry its stormwater.

44.     Though the City's MS4 shows the 24" pipe outlet, it has omitted the ditch into which that water is discharged, and has omitted the ditches into and through the SFCC property through which that stormwater has been directed and flows.

45.     Stormwater flows from the Shaker Heights and the Munger Hill area developments discharge from the 24" reinforced concrete pipe ("RCP") outlet, just south of the Springfield Water Department water line, into the unmapped drainage swale/channel.

46.     When it rains, water from the intersection of Crawford Drive and Falley Drive gushes out the 24" diameter storm drain pipe with great velocity, carrying with it street debris and pollutants.

47.     The moving polluted water then travels further down the hill, having eroded a gulley primarily on the Gezotis property, with a calculated volume of over 700 cubic yards of those eroded materials having been carried by the stormwaters onto the SFCC property.

48.     The area immediately downstream of the stormwater outlet has significant erosion of the channel interior through downward scour and a loss of the channel embankment directly south of the outlet pipe.

49.     The City previously assumed responsibility for

10

maintenance of its stormwater open channel conveyance by placing large diameter angular rip rap stones directly below the outlet of the 24" RCP pipe, but has failed to undertake any other management of the eroding open channel conveyance.

50.    There is extensive ongoing erosion downgradient of the area of riprap. The rip rap at the RCP outlet has not provided scour protection for the heavily eroded channel below the rip rap, between the 24" outlet and the property boundary of SFCC.

51.    The discharge velocity and volume of stormwater at this location is resulting in continuing erosion, causing a loss of soil with sediment being conveyed through the Gezotis property during rain events and depositing the sediment downstream onto the SFCC property.

52.    The stormwater flows through the eroding open gully between the 24-inch outlet and the SFCC northern property boundary, and then onto the SFCC property along and across the 6th fairway. In the area just north of the 6th fairway, sedimentation resulting from the erosion higher in the channel has a depth of 4-12 inches of recently accumulated sediment.

53.    The layers of deposited sediment consist of sand with soil characteristics consistent with the soils along the banks of the eroded channel. The sediment deposited in this area originated from the materials eroded from within the channel.

54.    The stormwater discharge has resulted in the most deeply scoured section of the gully intersecting groundwater, resulting in unidirectional flow within a defined channel on the ground surface. The deepest scour was visually estimated to be 6-8 feet below the adjacent ground surface.

55.    During dry weather, the water from the intersected groundwater infiltrates into the ground prior to reaching the 6th fairway, with periods during the year in which no stream

flows are present in the area immediately upgradient of the 6th fairway and no water flows within the ditch along the southern side of the 6th fairway.

56.     But during storm events, the stormwater discharging from the 24" pipe outlet carries sediments, street pollutants, and eroded sediment down the eroded channel and then over and across the 6th hole fairway.  Once reaching the southerly, downgradient side of the 6th hole fairway, approximately 300 feet south of the point where the water enters the premises, the stormwater then reaches and flows along a channel/drainage ditch that is south of the 6th fairway carrying sediments towards the 5th hole and a designated drinking water regeneration zone and into regulated and protected wetlands.

57.     Auger core samples of the subsurface sediment layers were extracted within the drainage channel/stream just south of the 6th fairway to a depth of 20 inches.  These samples show layers of relatively clean sand that appeared consistent in color, texture and size to the sediment found on the north side of the 6th fairway and with the materials from the actively eroding sides of the gully.

58.     These layers were formed with intervening layers of darker, primarily organic sediment originating from the gully and being carried downgradient during periodic high flow events from the upstream erosion.

59.     The organic materials (such as leaves from trees) then accumulate over the sediment during periods with low flows. Each successive layer of organics gets covered during the next high flow event, causing erosion within the gully and carries the sediment downgradient.

60.     The City's stormwater flows over the surface of the 6th fairway, causing erosion of the surface of the fairway and depositing sediment there and in the downgradient wetlands.

61. An area that now consists of Bordering Vegetated Wetlands and Bank of intermittent stream located within the SFCC south and down gradient of the 6th fairway includes an area that was previously a pond with open water adjacent to the 5th green.

62. The sediment layers in the downgradient wetlands located south of the 6th fairway have relatively uniform thicknesses, which is a typical characteristic one would expect to observe resulting from periodic high flow events with erosion and sediment carried downstream to a point where the flows slow down enough for the sediment to settle out of the stormwater and become deposited.

63. The former pond adjacent to the 5th green is now essentially an herbaceous marsh, which has many layers of sediment beneath it.

## CLAIMS FOR RELIEF

### Count I - Violations of Clean Water Act
### Failure to Comply with Permit Control Measure #3

64. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

65. The City is subject to the requirements of the MS4 General Permit for stormwater discharges from small municipal separate stormwater sewer systems issued by the U.S. EPA and the MassDEP on December 7, 2020, and modified on January 6, 2021 ("the Permit").

66. Violations of the Permit occur each day measurable stormwater is discharged from the 24-inch pipe. Thus, the City is liable under the Clean Water Act and EPA regulations to pay daily civil penalties of up to $66,712 per day for every day that a

measurable volume of precipitation has fallen while the City has remained in non-compliance.

67. The Permit is structured around six control measures ("CM"), including CM #3: Illicit Discharge Detection and Elimination, Permit Section 2.3.4.

68. According to the City's Stormwater Management Program Plan ("SMPP"), updated June 2023, prepared by the City as required by the Permit, the City is required to update the system map required by the Permit to include "outfalls and receiving waters, open channel conveyances, interconnections with other MS4s and other storm sewer systems, municipally-owned stormwater treatment structures, waterbodies (name and use impairments), and initial catchment delineations."

69. The City's mapping omits the open channel where stormwater is discharged from the 24-inch conveyance in violation of its permit.

70. By failing to map the drainage easement and open channel conveyance, and allowing over 700 cubic yards of sediment to erode from the channel and deposition of this material on downgradient properties and within downgradient wetland resources and designated water supply recharge areas, the City has violated the terms of its Permit and the Clean Water Act, including CM# 3.

71. Each and every day during which the City has discharged and continues to discharge stormwater from their MS4 from the 24" pipe is a separate and distinct violation of Sections 30l(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 131 l(a) and 1342.

**Count II - Violations of Clean Water Act**
**Failure to Comply with Permit Control Measure #5**

72. Plaintiff incorporates the allegations contained in the above paragraphs as

though fully set forth herein.

73.    The City is subject to the requirements of the MS4 General Permit for stormwater discharges from small municipal separate stormwater sewer systems issued by the U.S. EPA and the MassDEP on December 7, 2020, and modified on January 6, 2021 ("the Permit").

74.    Violations of the Permit occur each day measurable stormwater is discharged from the 24-inch pipe. Thus, the City is liable under the Clean Water Act and EPA regulations to pay daily civil penalties of up to $66,712 per day for every day that a measurable volume of precipitation has fallen while the City has remained in non-compliance.

75.    The Permit is structured around six control measures ("CM"), including CM #5: Post-Construction Stormwater Management.

76.    CM #5 requires the City to develop post-construction stormwater runoff program procedures to reduce the discharge of pollutants found in stormwater through the retention or treatment of stormwater on regulated new or redevelopment sites within the regulated MS4 area.

77.    The City has no apparent procedures in place to actually inspect all existing stormwater facilities and has never inspected the open channels located at or flowing towards the SFCC.

78.    Other than by placing a small area of large size "rip-rap" directly beneath the outfall of the 24" pipe outlet, the City has never managed, repaired or improved the open stormwater channels impacting the SFCC, despite documentation indicating it has knowledge of and recognized its responsibility for these stormwater channels.

79.     Though it has never solved the problem caused by its excessive flows and lack of maintenance of the easement where it crosses the 6th fairway, the City has on several occasions acknowledged its responsibility to maintain the easement.

80.     Despite the City's acknowledgement of its obligation to maintain the easement, the City failed, though required by its grant of easement, to install the 30-inch pipe and to maintain all ditches and conveyances through and along which the City directed its stormwater, and took no other measures to manage the stormwater as it flows across the 6th fairway and into and through the SFCC property.

81.     Despite repeated attempts by SFI to compel the City to document and mitigate the illegal discharge of stormwater at the SFCC, and the City's acknowledgement of its legal obligation to do so, the City has utterly failed to take action to address the impact of uncontrolled discharge of stormwater onto the SFCC.

82.     The City is in violation of CM #5.

83.     Each and every day during which the City has discharged and continue to discharge stormwater from their MS4  from the 24" pipe is a separate and distinct violation of Sections 30l(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 131 l(a) and 1342.

### Count III - Violations of Clean Water Act
### Unauthorized Discharge of Pollutants into Waters of the United States

84.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

85.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 131 l(a), prohibits the discharge of any pollutant from any "point source" to waters of the United States, except for discharges in compliance with an NPDES permit issued pursuant to Section 402(p) of the Clean

Water Act, 33 U.S.C. § 1342(p).

86. The City discharges stormwater containing pollutants from their MS4 in violation of the Clean Water Act into the waters of the United States within the Connecticut River watershed.

87. The City's discharge of stormwater from their MS4 are discharges of pollutants within the meaning of Section 502(12) of the Clean Water Act, 33 U.S.C. § 1362(12), as well as "point source" discharges into waters of the United States.

88. The City discharges pollutants to waters of the United States in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 131l(a).

89. Each discharge of pollutants constitutes a distinct violation of Sections 30l(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 131 l(a) and 1342.

### Count V - Violations of Clean Water Act
### Failure to Reduce Pollutants to the Maximum Extent Practicable

90. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

91. Operators of regulated MS4s are required to develop, implement, and enforce a stormwater management program designed to, *inter alia,* reduce the discharge of pollutants from the small municipal storm sewer system to the maximum extent practicable.

92. As an operator of a regulated SM4, the City is required to reduce the discharge of pollutants from the small municipal storm sewer system to the maximum extent practicable as part of its stormwater management program. 40 C.F.R. § 122.34(a).

93. The City has failed and continues to fail to reduce the discharge of pollutants from its MS4 to the maximum extent practicable.

17

94.    Each and every day during which the City has violated or continue to violate the requirement that they reduce the discharge of pollutants to the maximum extent practicable is a separate and distinct violation of the SM4 permit and Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 131 l(a) and 1342.

**Count VI - Violations of Clean Water Act**
**Failure to Implement Minimum Control Measures**

95.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

96.    As part of a stormwater management program, operators of regulated small municipal separate storm sewer systems are required to implement certain minimum control measures:

a.    Public education and outreach on stormwater impacts (including a public education program to distribute educational materials to the community or conduct equivalent outreach activities about the impacts of stormwater discharges and the steps that the public can take to reduce pollutants in stormwater runoff);

b.    Public involvement/participation (including providing opportunity for the public to participate in the development, implementation and review of the stormwater management program);

c.    Illicit discharge detection and elimination, in the form of a program to detect and eliminate illicit discharges, as defined by 40 C.F.R. §122.26(b)(2);

d.    Construction site stormwater runoff control;

e.    Post-construction stormwater management for new development and

redevelopment; and

    f.      Pollution prevention/good housekeeping for municipal operations.

97. The City has failed and continues to fail to implement the minimum control measures as required under 40 C.F.R. §122.26(b).

98. Each and every day during which the City has failed to implement minimum control measures is a separate and distinct violation of the small municipal separate storm sewer system permit and Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 131l(a) and 1342.

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

A.  Declare the City to have violated and to be in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 131l(a), for their unlawful and unauthorized discharges of pollutants into waters of the United States;

B.  Declare the City to have violated and to be in violation of Section 402 of the Clean Water Act, 33 U.S.C. § 1342, for their failure to comply with all applicable requirements of its Permit;

C.  Enjoin the City from discharging pollutants from its MS4 into the surface waters surrounding and downstream from the 24" pipe located just north of SFCC, except as authorized by and in compliance with its Permit;

D.  Order the City to comply fully and immediately with all applicable requirements of its Permit;

E.  Order the City to pay civil penalties of up to $66,712 per day for every day during

which a measurable volume of precipitation has fallen while the City has remained in non-compliance.

F.  Order the City to take appropriate actions to restore the quality of waters harmed by its discharges and to remedy harm to the surrounding ecosystems and communities affected by the City's noncompliance with the Clean Water Act;

G.  Award Plaintiffs costs (including reasonable investigative, attorney, witness, and consultant fees) as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and,

H.  Award any such other and further relief as this Court may deem appropriate.

## **<u>JURY DEMAND</u>**

Plaintiff requests a jury trial on the issue of liability and any other issue cognizable by a jury.

Respectfully submitted,

**SHAKER FARMS, INC.**


By its Attorney,

/S/ Donald P. Nagle
_____
Donald P. Nagle, Esq. (B.B.O. # 553544)
Law Office of Donald P. Nagle, P.C.
207 Front Street
Scituate, MA 02066
(781) 545-5001
nagle@dpnaglelaw.com

Date:  December 17, 2024